**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DORMAN PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TODD CARDELLO, <br><br> Defendant. | Civil Action No. |

**COMPLAINT**

Plaintiff Dorman Products, Inc. ("Dorman") files this Complaint against Todd Cardello ("Cardello") and states as follows:

**<u>INTRODUCTION</u>**

1.      This case concerns an opportunistic former Dorman senior executive who secretly negotiated employment with a key competitor in exchange for ***$1.75 million dollars*** while remaining subject to multiple non-competition covenants prohibiting such employment. Making matters worse, the executive did so while remaining privy to Dorman's most sensitive competitive information and strategies ***to compete against that very competitor***, including for the business of one of its largest customers in the midst of a pending competitive bid. The non-competition covenants at issue were signed in exchange not only for initial employment, access to the company's customer goodwill, most valuable customer relationships, and trade secret and confidential information, but also over $1,000,000 in equity grants and opportunities, including over $400,000 that vested before his resignation. Dorman urgently requires the Court's assistance to protect its legitimate interests and the lifeblood of its business.

2.      Until his abrupt resignation, Cardello served as Vice President, Sales & Category Management at Dorman, a leader in the aftermarket automotive parts industry. Cardello's role

placed him among Dorman's most senior leaders. Dorman trusted Cardello with its most sensitive trade secrets and other confidential business information, including Dorman's go-to-market, product, competitive defense, and pricing, margins, and profit strategies. He also had responsibilities with Dorman's Business Insights team, possessing intimate knowledge of Dorman's customer volumes, stocking strategies and inventory positions. Dorman also trusted Cardello—and compensated him handsomely—to oversee Dorman's hard-won relationships with various customers, including AutoZone Parts, Inc. ("AutoZone"), one of the company's key customers driving millions in revenue. As a result, Cardello on numerous occasions signed contracts with Dorman in which he agreed to respect Dorman's trade secrets and confidential information, to not compete against Dorman, and to not solicit Dorman employees, customers, suppliers, and other business relations for a short period of time following any employment separation. After accepting substantial compensation for years that he never would have received but for his restrictive covenants (including in particular the equity tied directly to those covenants), Cardello now seeks to just walk away from his end of the parties' bargain. And his new proposed employer, a critical Dorman competitor, is eager to help him do so, despite acknowledging the existence of the covenants and having no rational basis to deny that they are a direct competitor.

3.    On June 17, 2025, Dorman learned that AutoZone initiated a Request for Quote ("RFQ") process for the window regulator category, during which Dorman must present a competitive offering to maintain its position as AutoZone's primary source of window regulators. Cardello and other Dorman employees immediately began preparing a response, recognizing that Dorman's chief competitor for the window regulator category at AutoZone was TrakMotive

Global Industries, Inc. ("TrakMotive")[1] and that TrakMotive also sells driveshafts and axles to AutoZone.  This same team had experience defending a TrakMotive challenge a year prior and used that successful strategy as a foundation for the response to the RFQ.

4.     Despite the trust Dorman had placed in Cardello to lead its strategy to compete against TrakMotive, Cardello failed to disclose that he was already negotiating a potential job *with TrakMotive*.  Just two weeks later—in the midst of the RFQ—Cardello abruptly resigned and informed Dorman that he had accepted a new position *with TrakMotive*, a clear violation of his numerous non-competes.  He presented his offer letter, with a start date just six days in the future. Cardello's job title—Senior Vice President, Commercial Excellence—was a mystery to Dorman. His offer letter referred to a job description that was to be attached, but it was not.

5.     By virtue of his role with Dorman, Cardello possessed more critical confidential and proprietary information than nearly any other Dorman employee.  Just two months ago, and possibly while Cardello was already contemplating or negotiating for a role with TrakMotive, Cardello received a presentation about Dorman's three-year strategy for drivetrains.  That presentation specifically discussed Dorman's program value proposition versus TrakMotive on product coverage and pricing, identifying the part types where TrakMotive lags behind Dorman in coverage and price positioning by SKU segmentation.  With this information, along with Cardello's knowledge of Dorman's product margins, TrakMotive can accelerate product development and adjust pricing to diminish Dorman's value proposition.

6.     As another example, Cardello has been instrumental in crafting Dorman's response to the evolving tariff landscape.  As recently as May, Cardello was engaged in strategic

---

[1]   Upon information and belief, TrakMotive is an affiliate of Advanced Innovative Technology Corporation, and both companies are run by their founder and CEO, Robert Zhu.  Cardello's offer letter refers to both TrakMotive and Advanced Innovative Technology Corporation.

communications with Dorman employees about how to navigate current and anticipated tariffs, which included detailed financial analysis of competitive strategy against TrakMotive regarding driveshafts and window regulators.  He also advised on Dorman's strategy in responding to customer requests for tariff concessions.

7.      At the outset of Cardello's employment with Dorman, Cardello and Dorman entered into a contract that contained a covenant not to compete, covenants not to solicit customers and employees, and a confidentiality covenant (the "Employment Agreement").

8.      Moreover, during each year of his employment with Dorman, Cardello and Dorman entered into contracts that provided various equity awards to Cardello (the "Equity Agreements" and, together with the Employment Agreement, the "Agreements").  As a condition of these awards, Cardello accepted a covenant not to compete, covenants not to solicit customers and employees, and a confidentiality covenant.

9.      Cardello's employment with TrakMotive is a direct violation of his covenants not to compete.  Neither Cardello nor TrakMotive has been able to articulate any basis to assert that Dorman and TrakMotive are not competitors or that Cardello could work for TrakMotive without directly or indirectly competing against Dorman; instead, they attempt to sidestep the issue by claiming that there is no problem because Cardello's unexplained new job is allegedly not customer-facing.  But even if Cardello's and TrakMotive's representations were accurate (which Dorman seriously doubts), that is not the test under the Agreements and does nothing to protect Dorman from Cardello contributing to TrakMotive's strategy to compete against Dorman, including assisting TrakMotive's strategies for pricing, competitive bids, product development, RFQ responses, and more, regardless of whether he directly interfaces with customers.

10.     Accordingly, Dorman seeks injunctive relief to (a) stop Cardello from breaching his non-competition obligations; (b) enjoin Cardello from engaging in unfair competition with Dorman; (c) enjoin the threatened improper disclosure and/or use of Dorman's confidential and proprietary information; and (d) require future assurances from Cardello that he is complying and will continue to comply with his legal obligations to Dorman going forward.

## PARTIES

11.     Plaintiff Dorman Products, Inc. is a Pennsylvania corporation headquartered at 3400 E. Walnut Street, Colmar, PA 18915.

12.     Defendant Todd Cardello is a natural person and citizen of New Jersey. He resides at 11 Evita Terrace, Long Valley, NJ 07853.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because (i) Dorman and Cardello are citizens of different states, and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a); *see* Ex. A, Decl. of Jeff Darby.

14.     This Court has personal jurisdiction over Cardello because (i) he agreed to submit to the jurisdiction and venue of this Court in each of the Equity Agreements, (ii) he was employed by and worked for Dorman in its Colmar, Pennsylvania headquarters, and/or (iii) many of the transactions and occurrences that Cardello undertook to refrain from competing against and the confidential information he agreed to protect occurred or lie within Pennsylvania.

15.     Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because (i) Cardello "irrevocably and unconditionally waives any objection" to such venue for "any actions, suits or proceedings arising out of or relating to" the equity awards, (ii) a substantial part of the events or omissions giving rise to the claims

detailed herein occurred in this district, and (iii) Cardello is subject to the personal jurisdiction of this Court.

## FACTS

### I.    The Nature of the Dorman and TrakMotive Businesses

16.    Dorman was founded in 1978 as a family business by Richard and Steven Berman, and it subsequently became publicly traded on the Nasdaq Stock Market LLC in 1991. Dorman is a pioneer in the automotive aftermarket. Dorman offers alternatives to original equipment manufacturer parts. Dorman's catalogue comprises products across various categories, including, for example, window regulators, driveshafts, and axles.[2]

17.    Dorman's products are sold through various channels, including automotive aftermarket retailers, distributors, and specialty markets. Dorman sells its products to retailers dealing in automotive replacement parts, such as AutoZone, Advance Auto Parts, Inc., Ozark Purchasing, LLC (a/k/a O'Reilly Auto Parts), Genuine Parts Company (a/k/a NAPA), and Amazon.com.

18.    TrakMotive is a relatively new market entrant founded by Robert Zhu in 2017. TrakMotive is a direct competitor of Dorman and also operates in the automotive aftermarket, specializing in underbody parts, including window regulators, driveshafts, and axles (all of which are product lines Dorman also operates in). *See Products*, TrakMotive https://www.trakmotive.com/products/ (last accessed July 28, 2025).

19.    Zhu also founded and is the CEO of Wonh Industries in Ningbo, China.

---

[2]    A window regulator is a mechanical device inside a car door that moves the window glass up and down. It connects the window motor to the window glass, ensuring smooth and controlled movement. A driveshaft is a mechanical component that transmits torque from the engine to the wheels in a vehicle. An axle is a central shaft that connects a pair of wheels on either side of the vehicle and is often connected to a drive shaft.

20.    The threat of fast followers—companies that enter a market after an innovator and quickly imitate products or services—is particularly salient in the aftermarket automotive part industry.  TrakMotive is a fast follower, often targeting Dorman.

21.    Dorman has defended, and continues to defend, challenges from TrakMotive to its business, including its relationships and contracts with key customers.  Cardello was instrumental in designing the defense of and then defending Dorman's business against TrakMotive, particularly as it relates to AutoZone, and received substantial confidential and trade secret information about Dorman's efforts to compete against TrakMotive.

22.    Rather than build its business the right way, as Dorman has done since its inception, TrakMotive seeks to shortcut the process and gain an unlawful competitive advantage by hiring Cardello in violation of his non-competition agreement and to obtain his critical knowledge about Dorman's business, including information about Dorman's products and strategies to retain customers, including pricing and customer/product margins, management of tariffs, and how Dorman markets to customers its advantages over TrakMotive.  Cardello's knowledge of Dorman's margins—confidential, competitive information—is particularly threatening because the information can be used to help TrakMotive directly and immediately undercut Dorman's pricing, all without Cardello ever having to engage with a customer.  Dorman welcomes fair and legitimate competition, but unfair competition predicated on contractual breaches and impermissible knowledge of Dorman's business strategies and information should be stopped.

## II.    Cardello's Relationship with Dorman

23.    Cardello joined Dorman in 2020 as Vice President, Category Management & Business Insights.

24.    In 2024, Dorman promoted Cardello to Vice President, Sales & Category Management, a senior-level role at Dorman.  Cardello maintained this senior position until his

resignation.  Cardello worked across all of Dorman's customers in his role, and the Dorman team he managed had primary responsibility for Dorman's relationship with AutoZone.

25.    In Cardello's role, he was the executive point person leading both (i) category management, with responsibility for how Dorman positions products in the marketplace, and (ii) pricing, which included influencing market pricing and product placement, as well as company and product margins.  Cardello was also responsible for managing Dorman's strategic response to line reviews.[3]  Line reviews are the primary mode by which Dorman and its competitors increase or lose business with customers, and they rise or fall on each company's specific, confidential strategy to defend its position.

26.    Given his position, Cardello had access to numerous strategic undertakings and future initiatives at Dorman, even presenting information to Dorman's Board of Directors on Dorman's strategy.  His most recent briefings to the Board related to category management and business insights, questions regarding current and projected customer demand, competitive threats in the marketplace, customer pricing, the company's sales playbook initiatives, projected growth across key customers, and strategies to drive incremental growth.  He routinely developed and had access to Dorman's most confidential and competitively sensitive information and plans and participated in strategic meetings to act on this information on behalf of Dorman and in competition with competitors such as TrakMotive.

27.    In the weeks leading up to Cardello's resignation, Cardello participated in and was tasked with leading Dorman's RFQ process against TrakMotive for AutoZone.

---

[3]    A line review is a process by which a retailer assesses various manufacturers' products within a specific category to determine which products will be carried.  Dorman's customers typically conduct line reviews on an annual basis.

28.    Success in the RFQ process is crucial to Dorman maintaining its strong position with AutoZone.  Cardello was involved in the same RFQ process in 2024, and he has detailed knowledge of Dorman's successful strategy for differentiating its business from TrakMotive's.

29.    Cardello's strategic knowledge that goes to the heart of Dorman's competitive advantages extends well into the future.  For instance, on May 12, 2025, Cardello attended a lengthy meeting to review the highly confidential *three-year plan* for Dorman's driveshaft product line.  The meeting and accompanying presentation included detailed data on Dorman's value proposition versus TrakMotive on product coverage and pricing.  The presentation also highlighted Dorman's non-public strategy to maintain its competitive position.  With this information, a company like TrakMotive has an unfair competitive advantage and can focus its overall strategy, product development and pricing to diminish Dorman's value proposition.

30.    Just three weeks before he resigned, Cardello also received year-in-review materials that focused heavily on the details of Dorman's relationship with AutoZone across product lines, including financials, margins, strategy, and competitive defense plans in particular.  The materials also discussed proposed areas of expansion and existing threats into 2026, including from TrakMotive.

31.    Cardello is aware of customer pressures relating to changing tariff rates and Dorman's ongoing discussion of responses.  He attended a meeting on June 23, 2025—even though he surely was in negotiations to accept employment with TrakMotive by then—at which Dorman's strategy for dealing with these pressures was discussed.  He also was the primary person Dorman tasked with negotiating the company's latest tariff price change with AutoZone.  Dorman can only conclude that Cardello did his best to continue to receive Dorman's most sensitive competitive information right up to the end of his employment, all for the benefit of TrakMotive.

32.    Not once while receiving the sensitive information and participating in the critical meetings described above did Cardello share that he was in negotiations with and intending to join TrakMotive.

### III.    Cardello's Contractual Obligations to Dorman

33.    In consideration of providing Cardello a position at Dorman with broad access to the company's most sensitive and confidential competitive information, along with a starting salary of $275,000 and annual incentive compensation of up to $137,500.  Dorman requested Cardello enter into the Employment Agreement, which he did in January 2020.  ("I, Todd Cardello understand that my position with Dorman Products is one of trust and confidence because of my access to trade secrets and confidential or proprietary business information.").

34.    Among other requirements, and to protect Dorman's customer goodwill and relationships against the inevitable use and/or disclosure of trade secret and confidential information if he were working for a competitor, the Employment Agreement's non-competition covenant required Cardello to abstain, for eighteen months from the termination of his Dorman employment and throughout the United States, from employment involving:

> the manufacture, distribution or sale of automotive replacement parts or general merchandise hardware of the kind or type sold by Dorman Products at the time of my termination or to be released by Dorman Products within one year following my termination.

35.    The Employment Agreement's customer non-solicitation covenant required Cardello to not, for eighteen months from the termination of his Dorman employment:

> solicit, recruit, encourage or induce any contractor, agent, client or customer, or supplier of Dorman Products to terminate its/his/her relationship with Dorman Products, in whole or in part, or solicit, induce or encourage any person/entity to terminate a contractual relationship with Dorman Products or to refrain from entering into a contractual relationship with Dorman Products (including, without limitation, any prospective customers/clients or suppliers of Dorman Products).

10

36.    Cardello also agreed that the limitations set forth in the Employment Agreement "are reasonable and properly required for the adequate protection of Dorman Products business" and, should a court deem "any such limitation unreasonable, [I] agree to the reduction of the limitation to the area or period which the court shall deem reasonable."

37.    Beginning in 2021, Dorman offered Cardello the opportunity to receive equity compensation.  In exchange for awards of stock options and restricted stock units totaling *over $1,000,000* (including over $400,000 that had already vested at the time of his resignation), Dorman again required certain commitments from Cardello, including a non-competition covenant and non-solicitation covenants.   Among other requirements, the Equity Agreements' non-competition covenants required Cardello to abstain, for one year from the termination of his Dorman employment and in any state, jurisdiction or territory in which Dorman and its affiliates are engaged in business, from employment involving:

> the manufacture, distribution or sale of automotive replacement parts or general merchandise hardware, including parts for heavy-duty vehicles, in each case including but not limited to those of the kind or type sold by the Company at the time of Participant's termination or scheduled to be released by the Company within one year following Participant's termination of employment or service.

Having accepted the enormous financial benefits of these equity awards, Cardello should be held to the bargain that precludes his new competitive employment.

38.    Cardello also agreed for one year to abstain from recruiting Dorman's customers or employees  on behalf of entities competitive with Dorman.

39.    Cardello further agreed to protect Dorman's confidential information and trade secrets, and not to:

> directly or indirectly, use or disclose for my own benefit or the benefit of another any of Dorman Product's trade secrets or confidential or proprietary information, whether or not the information is acquired, learned, attained, or developed by myself alone or in conjunction with others.

11

Given the facts detailed above, however, it is inconceivable how Cardello could work in his new mystery job for TrakMotive without inevitably disclosing or at least using Dorman's trade secret and confidential information.

40.    The Equity Agreements contain a Philadelphia forum selection clause and a Pennsylvania choice of law provision that govern this action arising out of the Agreements:

> The validity, performance, construction and effect of this Award shall be governed by the laws of the Commonwealth of Pennsylvania, without giving effect to principles of conflicts of law.  Participant hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the Commonwealth of Pennsylvania and of the United States of America, in each case located in Philadelphia, Pennsylvania, for any actions, suits or proceedings arising out of or relating to this Award and the transactions contemplated hereby ("Litigation") and agrees not to commence any Litigation except in any such court, and further agrees that service of process, summons, notice or document by U.S. registered mail to his respective address shall be effective service of process for any Litigation brought against him in any such court.  Each party hereby irrevocably and unconditionally waives any objection to the laying of venue of any Litigation in the courts of the Commonwealth of Pennsylvania or of the United States of America, in each case located in Philadelphia, Pennsylvania, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any Litigation brought in any such court has been brought in an inconvenient forum.

41.    The Employment Agreement also contains a Pennsylvania choice of law provision that governs this action arising out of the Agreement.

## IV.    Cardello's Planned Departure to TrakMotive

42.    On July 1, 2025, Cardello advised Dorman of his resignation.  Cardello further advised Dorman that he had accepted a position as Senior Vice President, Commercial Excellence with TrakMotive, reporting directly to the company's CEO.  The position did not previously exist and was created for Cardello.  He provided no information about his anticipated duties and TrakMotive still has not provided his job description, instead claiming that he will not directly engage with sales/customers—despite the fact that this is what he has done for years.  Whether

12

Cardello will engage directly with sales/customers is irrelevant, as his mere employment by TrakMotive violates his noncompete agreements.

43.    Cardello is to be paid a salary of $375,000, receive an annual car allowance of $9,000, and is eligible for a bonus of up to 35% of his salary (i.e., $131,250).  He is to be paid a retention bonus of $550,00 over his first two years of employment with TrakMotive.  Cardello will also participate in TrakMotive's long term incentive program and receive an award of up to 30% of his salary (i.e., $112,500) annually.  In sum, if Cardello joins TrakMotive, he stands to make over $1.75 million in the next two years.  Dorman reasonably questions what could possibly support this outsized compensation package for someone allegedly being taken out of the sales work that has been his strength for years, and the answer appears to be the purchase of Dorman's competitive information and TrakMotive's hopes that it can acquire, via a shortcut, the business that Dorman spent decades to develop.

44.    Cardello and TrakMotive  refuse to confirm that Cardello will honor his non-competition obligations.  Given the companies' competitive relationship, therefore, it is only reasonable to expect that Cardello's responsibilities will include, even if not directly part of sales, driving TrakMotive's go-to-market strategy and the direction and oversight of new product development.  Because of Cardello's position and responsibilities, it is inevitable that he will disclose or at a minimum use Dorman's confidential information and trade secrets.  He cannot simply wipe all of the sensitive information from his mind, and thus his activities and decisions at TrakMotive necessarily will be informed by Dorman's information.

45.    Shortly after Cardello provided his resignation notice, Dorman reminded Cardello of his obligations under the Agreements.  On July 2, 2025, Dorman sent Cardello a letter to remind him of his various obligations to Dorman and copied TrakMotive.  Among other things, the letter

reminded Cardello of his ongoing obligations to Dorman contained in the Agreements and informed him that his planned employment with TrakMotive violates the Agreements. Dorman has also advised TrakMotive of Cardello's obligations both with a copy of such letter and indirectly through legal representatives.

46.     Cardello has never responded, not even to confirm that he will comply with his confidentiality obligations.   Instead, nine days later, Dorman received a response from TrakMotive. The letter restated Cardello's anticipated title at TrakMotive, but did not provide any additional detail about the contemplated role.   And apparently there is still no formal job description, although it was identified as an attachment to the offer letter for a job he was supposed to start weeks ago.

47.     The letter also implicitly acknowledged that Cardello will be violating his non-competition agreements by working for TrakMotive:

> We have been assured that Mr. Cardello has honored and will continue to honor the enforceable provisions of his January 20, 2020 Agreement, **specifically including paragraph 1(b) & (c) and 4(a) & (b)** as we understand them. We do not believe that employing Mr. Cardello in this role violates any enforceable provisions of the January 20, 2020 Agreement or Restricted Stock Award.[4]

The non-compete covenant is found in paragraph 4(c).  TrakMotive makes no assurances that Cardello's employment will not violate the non-compete—because clearly it will.

48.     Cardello has decided to breach his non-competition covenant and accept a position with TrakMotive effective August 1, 2025, just one month after his last day with Dorman on July 1, 2025.

---

[4]   The letter did not address which provisions of the Equity Agreements Cardello and TrakMotive believe are enforceable, though the covenants in those agreements are not the same as those contained in the Employment Agreement.

49.    Upon information and belief, Cardello has also decided to breach his Dorman customer non-solicitation covenant and assist TrakMotive in obtaining business with AutoZone, and likely other customers.  At a minimum, he inevitably will breach that commitment through his duties at TrakMotive.

**COUNT I: BREACH AND
ANTICIPATORY BREACH OF CONTRACT**

50.    Dorman incorporates the allegations of paragraphs 1 through 49 as though fully stated herein.

51.    The Agreements are valid and enforceable contracts under the laws of the Commonwealth of Pennsylvania and supported by adequate consideration.

52.    The reasonableness of the Agreements is further evidenced by the significant benefits conferred on Cardello by Dorman in exchange for his faithful compliance with his obligations.  Cardello agreed when entering into the Equity Agreements that his restrictive covenants are "necessary for the protection of the business and goodwill of [Dorman]" and "reasonable for such purpose."

53.    Cardello has breached or will breach the Agreements by becoming employed by TrakMotive, a direct and core competitor of Dorman.

54.    Indeed, TrakMotive's counsel's letter *excluded* Cardello's non-competes from the covenants for which it assures compliance.  Given that TrakMotive and Dorman are direct competitors, Cardello's role at Dorman, and TrakMotive's and Cardello's refusal to share a formal job description and confirm non-compete compliance, Dorman can only conclude that Cardello's role will overlap substantially with his role at Dorman and involve competing against Dorman's business.

15

55.     Cardello's resignation from Dorman and acceptance of a Senior Vice President position at TrakMotive manifest his absolute and unequivocal refusal to comply with his obligations under the Agreements.  Given that conduct, there is no reason to believe that Cardello would comply with his other contractual obligations, such as to not use or disclose confidential information and to not solicit employees or customers.

56.     Dorman requests temporary, preliminary and permanent injunctive relief.

57.     The equities favor relief.  Cardello would not be unduly burdened by compliance with the Agreements, which do not unreasonably restrict his employment.  For example, he could seek employment with one of Dorman's customers, or with certain other aftermarket automotive companies, to the extent their product categories do not overlap with Dorman's.  In addition, Cardello only entered the aftermarket automotive field when he commenced employment with Dorman, and he could accept comparable employment with employers in any number of other fields.  Cardello has fifteen years of experience working in marketing leadership for Mars, Inc., a global consumer goods company, as one example.  His ability to successfully shift industries to the automotive aftermarket with Dorman demonstrates that he can again shift industries and still occupy a similar leadership role.  Instead, he affirmatively chose to join a key competitor regardless of his commitments.

58.     Dorman is likely to succeed on the merits of its claims in this case because Cardello breached the valid and enforceable provisions of the Agreements related to non-competition, and employment with TrakMotive is likely to also breach his confidentiality and non-solicitation obligations.  Since Cardello will be in a leadership position, reporting directly to the CEO, of a business who competes directly and aggressively with Dorman across its product categories, he will likely breach his commitment not to disclose or use Cardello's trade secrets and confidential

information concerning these very subjects.  Moreover, Cardello's broad (and hidden) responsibilities at TrakMotive make it likely that he will violate his agreement not to, directly or indirectly, recruit customers on behalf of entities competitive with Dorman, such as the main customer he serviced at Dorman, AutoZone.

59.     If a preliminary injunction is not entered, Dorman will be irreparably harmed through loss of its customer goodwill, market share, business opportunities, competitive advantage, confidential information, and relationships with customers, prospective customers, and distribution partners.

60.     Dorman will suffer far greater harm if a preliminary injunction is not granted than Cardello will suffer if he is required to simply adhere to the contractual obligations and promises he made to Dorman in the Agreements.  There are countless employment opportunities he could pursue while abiding by his commitments.

## COUNT II: UNFAIR COMPETITION

61.     Dorman incorporates the allegations of paragraphs 1 through 60 as though fully stated herein.

62.     By mere virtue of his employment with Dorman, Cardello inevitably will improperly disclose or at least use Dorman's trade secret and confidential competitive information. And there is no reasonable expectation that he would even attempt to abide by his confidentiality obligations given how he has simply cast aside his non-competition commitment.

63.     Dorman requests preliminary and permanent injunctive relief.

64.     Dorman is likely to succeed on the merits of this dispute regarding Cardello's shift in loyalty to TrakMotive, because Cardello has admitted to imminent employment with TrakMotive, and because TrakMotive is plainly in significant competition with at least Dorman's

17

window regulator, driveshaft, and axle product lines, in which Cardello necessarily will be significantly involved (as they are TrakMotive's only lines).

65.    Dorman will be immediately and irreparably harmed once Cardello confers on TrakMotive his knowledge of and experience with Dorman's go-to-market and pricing strategies, defense of challenges during line reviews, and future business plans, and otherwise inevitably discloses Dorman's confidential, competitive information.

## PRAYER

66.    Dorman requests temporary, preliminary and permanent injunctive relief that:

    a.    Restrains Cardello from accepting employment with and being employed by TrakMotive for a period of eighteen months following the effective date of his resignation from Dorman, or from a later date based on equitable tolling given that he has refused to date to comply with his obligations;

    b.    Further restrains Cardello from breaching the non-competition, non-solicitation, and non-disclosure provisions of the Agreements for the restricted periods outlined in the Agreements and, with respect to non-disclosure obligations, in perpetuity.

67.    To the extent the Court determines that the Employment Agreement has been superseded by the Equity Agreements, or to the extent that the Court relies on the significant additional consideration supporting the Equity Agreements, Dorman requests the above preliminary and permanent injunctive relief for a period of twelve months, subject to any extension based on equitable tolling given Cardello's conduct.

68.    Dorman respectfully requests that the Court enter judgment for Dorman and further requests all other appropriate relief to which Dorman may be entitled.

Date:  July 28, 2025                    Respectfully submitted,


                                        /s/ Michael J. Puma
                                        Michael J. Puma (Bar No. 94463)
                                        Alexis Caris (Bar No. 330623)
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        2222 Market Street
                                        Philadelphia, PA  19103
                                        Telephone: (215) 963-5000
                                        Facsimile: (215) 963-5001
                                        michael.puma@morganlewis.com
                                        alexis.caris@morganlewis.com


                                        *Counsel for Plaintiff Dorman Products, Inc.*

19